# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LAURA WARD, as personal representative
of Valerie Ward, deceased,

      Plaintiff,

vs.                                                                                                                                            CIVIL NO. 99-98 LFG/DJS

PRESBYTERIAN HEALTHCARE SERVICES,
d/b/a Presbyterian Kaseman Hospital; PRESBYTERIAN
HEALTH PLAN, INC., d/b/a Presbyterian Salud; FHC
OPTIONS, INC., a foreign corporation; THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW MEXICO,
d/b/a University of New Mexico Mental Health Center;
and ROBERT KELLOGG,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING UNM BOARD OF REGENTS' MOTION TO DISMISS

      THIS MATTER comes before the Court on Defendant The Board of Regents of the University of New Mexico's ("UNM") Motion to Dismiss Plaintiff's Civil Rights Claims for Failure to State a Claim Upon Which Relief Can Be Granted. [Doc. 24]. Defendant UNM moves to dismiss count nine of Plaintiff's Second Amended Complaint [Doc. 34] for alleged violation of civil rights under 42 U.S.C. § 1983. In accord with the district's motion practice rule, the motion, response and reply were simultaneously filed. Oral argument is not necessary.

**Background**

Laura Ward ("Laura") is the Personal Representative of her deceased daughter, Valerie Ward ("Valerie"). Laura pursues several claims and causes of action against the various Defendants in her Second Amended Complaint filed April 22, 1999. Against Defendant UNM, Laura asserts common law tort claims, claims arising under the Emergency Medical Treatment and Active Labor Act (EMTALA) 42 U.S.C. § 1395dd, and civil rights claims under 42 U.S.C. § 1983.

**General Statement of Facts**[1]

On July 16, 1998, Laura took her daughter Valerie to UNM Family Health Center in Albuquerque, New Mexico. There Valerie was evaluated by Dr. Ivan Pinon. Valerie's health insurance plan through Presbyterian Salud covered psychiatric care only at Presbyterian Kaseman Hospital ("PKH") and required that Valerie first seek an evaluation from PKH. Dr. Pinon referred Valerie to PKH for evaluation and hospitalization, but was informed that no beds were available. Dr. Pinon then called UNM Mental Health Center ("UNMMHC") to have Valerie admitted there. He was informed that Valerie's insurance program was inappropriate for payment at UNMMHC and that she could not be admitted to UNMMHC. Dr. Pinon then instructed Laura to take Valerie to PKH's Mental Health Unit for evaluation, which she did.

At the PKH Mental Health Unit, Laura informed hospital employees of the nature of her daughter's problems, and requested that her daughter be admitted. Laura was informed that PKH had no space available and was told she should take Valerie to UNMMHC. No screening or evaluation was conducted by PKH.

---

[1] This Statement of Facts, accepted as true under Fed. R. Civ. P.12(b)(6) is drawn from Plaintiff's complaint. Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488 (10th Cir. 1995).

2

Upon arriving at UNMMHC in the afternoon of July 16, 1998, Valerie was instructed to sign in, have a seat and wait to be seen. While waiting, she was informed that UNMMHC had called PKH to obtain authorization for admission and that UNMMHC was awaiting a return call. Laura and Valerie were eventually called into an office where an employee interviewed Valerie and informed Laura and Valerie that UNMMHC was still awaiting a return call from PKH regarding insurance coverage. At some point during the interview, due to Valerie's agitation, the employee suggested that she "go outside and have a smoke."

Between 4:00 and 4:30 p.m., Laura realized that Valerie was no longer in the area and she began a search. Valerie had left the UNMMHC, walked to a nearby building, and at some time between 4:45 and 5:00 p.m. jumped from the fifth floor, killing herself.

## Present Motion

Defendant UNM seeks dismissal of Laura's 42 U.S.C. § 1983 civil rights claim on the grounds that the claim has no basis in law. Plaintiff contends that the application of factors annunciated in Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S. Ct. 444 (1989) lead to the conclusion that the claim does have a sound basis in law and should be allowed to proceed. The question before the Court is whether 42 U.S.C. § 1395dd (EMTALA) does create a right to certain medical care that is cognizable as a 42 U.S.C. § 1983 civil rights claim.

## Federal Rules of Civil Procedure 12(b)(6) Standards

In reviewing a motion to dismiss, the Court must "accept all well-pled allegations as true." Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1496 (10th Cir. 1995), and "indulge all reasonable inferences in favor of the plaintiff." Weatherhead v. Globe Intern., Inc., 832 F.2d 1226, 1228 (10th Cir. 1987). "The issue is not whether a plaintiff will ultimately prevail, but whether

3

claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. . 1683 (1974), *overruled on other grounds,* Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982). It is with these standards in mind that the Court considers Defendant's motion.

### Right to Medical Care

The Constitution does not create any entitlement to elementary protective services nor does it guarantee the adequacy of those services to members of the public at large. Jackson v. Byrne, 738 F.2d 1443, 1447 (7th Cir. 1984). As a general matter, a state is under no constitutional duty to provide substantive services for those within its borders. Youngberg v. Romero, 457 U.S. 307, 317, 102 S. Ct. 2452, 2459 (1982). See also Harris v. McRae, 448 U.S. 297, 318, 100 S. Ct 2671, 2689 (1980) (There is no obligation on the states to pay any medical expenses of indigents.); Maher v. Roe, 432 U.S. 464, 469, 97 S. Ct. 2376, 2380 (1977) (There is no affirmative obligation upon the state to fund abortions or other medically necessary services.).

Both the Supreme Court and various circuit courts have indicated that the existence of a "special custodial or other relationship" between an individual and the state may trigger a constitutional duty on the part of the state to provide certain medical or other services. Jackson v. Byrne. The Supreme Court has held that the Eighth Amendment prohibition against cruel and unusual punishments, applicable to the states via the Fourteenth Amendment, requires states to provide medical care for those whom it is punishing by incarceration. Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). Similarly, an involuntarily committed mental patient retains certain constitutionally protected substantive liberty interests under the Fourteenth Amendment to adequate food, shelter, clothing, and medical care. Youngberg at 315, 102 S. Ct at 2457.

A constitutional duty can arise only when a state or municipality, by exercising a significant degree of custody or control over an individual, places that person in a worse situation than he would have been in had the government not acted at all. Such a situation could arise by virtue of the state affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. The key concept is the exercise of coercion, dominion, or restraint by the state. The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it will be constitutionally required to care and provide for that person. Wideman v. Shallowford Community Hospital, Inc., 826 F.2d 1030, 1035, 1035 (11th Cir. 1987). (citations omitted).

There is no contention that Valerie was in some special custodial relationship with the State of New Mexico, and, therefore, the proposition that there is no Constitutional right to medical care is not in dispute.

### **Right to Medical Care Under EMTALA**

Plaintiff does not specifically allege a Constitutional right to medical care, but rather asserts that this is civil right to which she is entitled based upon the requirements set forth in 42 U.S.C. § 1395dd (EMTALA). (Second Amended Complaint ¶¶ 82, 83, 84, 100, 101 and 102).

Congress created the Emergency Medical and Treatment and Active Labor Act, 42 U.S.C. § 1935dd, in 1986. Section 1395dd(a) imposes a medical screening requirement upon hospitals with emergency departments: "[I]f any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services . . . to determine whether or not an emergency

medical condition exists." Section 1395dd(b), provides in pertinent part: "(1) If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either - (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section . . . . " Section 1395dd(c) generally restricts transfers of unstabilized patients, and Section 1395dd(d) authorizes both civil fines and a private cause of action for violations of the statute.

The purpose of EMTALA is to "prevent 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions are stabilized." Hardy v. New York City Health & Hospitals Corp., 164 F.3d 789, 792 (2d Cir. 1999). The EMTALA statute was not intended to "ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." Repp v. Anadarko Municipal Hospital, 43 F.3d 519 (10th Cir. 1994). EMTALA "places obligations of screening and stabilization upon hospitals and emergency rooms who receive patients suffering from an 'emergency medical condition'." Roberts v. Galen of Virginia, Inc., 119 S. Ct. 685 (1999). Section 1395dd(a) does not require that a hospital provide a medical screening in the abstract, but rather one that is appropriate "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department." Therefore, the statute's requirement is hospital specific, varying with the particular circumstances of each provider. A hospital violates EMTALA's appropriate medical screening requirement when it does not follow its own screening procedures. Repp at 522. "If a hospital's emergency room does not provide an 'appropriate medical screening' it is strictly liable." Id. at 522,

n. 5.  See also Abercrombie v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 681 (10th Cir. 1991).

EMTALA applies to all hospitals that participate in the federal Medicare program. The statute imposes two specific obligations on those hospitals. First, when an individual appears for treatment at a hospital's emergency room, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition exists. 42 U.S.C. § 1395dd(a).  Second, the hospital must stabilize a known emergency medical condition prior to transferring or discharging the patient.  42 U.S.C. § 1395dd(b)(1)(A).

These affirmative requirements impose a duty on the hospitals to provide certain care. The obligations are binding upon hospitals, with no distinction being drawn between private and state-run facilities.  EMTALA's requirements must be followed to the letter.  A strict liability standard is applied for non-compliance.  It is clear that the congressional intention was to ensure that anyone presented to a hospital, with a defined emergency medical condition, would receive proper treatment from the facility.  Indeed, EMTALA extends its protection to "any individual" who seeks emergency room assistance. The only distinction drawn is between people who have, or do not have, a defined emergency medical condition.

Thus, it is clear that EMTALA, in imposing duties upon hospitals to provide medical screening and treatment, concomitantly creates a right for an individual to receive that medical screening and treatment. EMTALA creates a right for an individual who comes to a hospital with an emergency medical condition (as defined in Section 1395dd(e)) to: 1) receive an appropriate medical screening examination within the capabilities of the respective hospital; and 2) receive necessary medical

7

treatment to stabilize a known emergency medical condition before the individual is transferred or discharged.

## 42 U.S.C. § 1983

Section 1983 authorizes the imposition of liability against "[e]very person" who, acting under the color of state law, violates another's federally protected rights. Martin A. Schwartz & John E. Kirkland, Section 1983 Litigation § 5.2 (3d ed. 1997). Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Wilder v. Virginia Hosp. Assoc., 496 U.S. 498, 508, 110 S. Ct 2510, 2516 (1990). A right of action created by statute relating to deprivation, under color of state law, of a right secured by the Constitution and laws of the United States encompasses claims which are based solely on statutory violations of federal law as well as the Constitution. Maine v. Thiboutot, 448 U.S. 1, 4, 100 S. Ct. 2502, 2504 (1980). It is well established that Section 1983 itself creates no substantive rights: it merely provides a remedy for deprivations of federal rights established elsewhere. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct 2427, 2432 (1985).

A rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision is no less binding than a rule that is based on the plain meaning of a statute. The violation of a federal right that has been found to be implicit in a statute's language and structure is as much a "direct violation" of a right as is the violation of a right that is clearly set forth in the text of the statute. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 112, 110 S. Ct. 444, 451 (1989).

A plaintiff alleging a violation of a federal statute will be permitted to sue under Section 1983 unless (1) the statute does not create enforceable rights, privileges, or immunities within the meaning

8

of Section 1983, or (2) Congress has foreclosed such enforcement of the statute in the enactment itself. Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 423, 107 S. Ct. 766, 770 (1987).

### EMTALA and 42 U.S.C. § 1983 violations

A determination that Section 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry. Golden State at 106, S. Ct. at 448. First the plaintiff must assert the violation of a federal right. Id. To determine whether the statute creates a "federal right" enforceable under Section 1983, a three-prong test is applied. The Court must determine: 1) whether the provision is intended to benefit the plaintiff; 2) whether the provision imposes a binding obligation on the governmental unit; 3) whether the interest is "too vague and amorphous" for judicial enforcement. Id.

Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress "specifically foreclosed a remedy under § 1983." Id. Congress may do so expressly in the statute itself or "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Blessing v. Freestone, ___ U.S. ___, 117 S. Ct. 1353, 1360 (1997). The availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a Section 1983 remedy; rather, the statutory framework must be such that allowing a plaintiff to bring a Section 1983 action would be inconsistent with Congress' carefully tailored scheme. Golden v. State at 107, S. Ct. at 448. The burden is on the defendant to demonstrate that Congress has expressly withdrawn the remedy. The Court does not lightly conclude that Congress intended to preclude reliance on Section 1983 as a remedy for the deprivation of a federally secured right. Id. (quoting Smith v. Robinson, 468 U.S. at 1012, 104 S. Ct.

9

3457, 3468 (1984)).

The first step of the inquiry requires the Court to consider and answer the above-referenced three questions. First, is the provision intended to benefit the decedent, Valerie Ward? Here it is obvious that EMTALA was intended to protect her. She was a person who presented herself to a hospital's emergency department seeking medical attention. EMTALA requires that an "appropriate medical screening examination" be provided to "any person" who comes to a hospital and requests examination and treatment for a medical condition. Second, does the provision impose a binding obligation on the governmental unit? EMTALA makes no distinction between government-run and non-government-run hospitals. Here, the obligation is imposed on hospitals and it makes no difference that the hospital is privately rather than publically operated. The provision created a binding obligation on the governmental unit. Third, is the interest "too vague and amorphous" for judicial enforcement? The abundance of case law concerning EMTALA demonstrates that the interests created are well suited for judicial enforcement; they are neither "too vague" or "too amorphous."

The second step of the inquiry is to determine whether Congress specifically foreclosed a remedy under Section 1983. In <u>Middlesex County Sewerage Authority v. National Sea Clammers Assn.</u>, 453 U.S. 1, 101 S. Ct 2615 (1981), a congressional intent to foreclose resort to Section 1983 was found in a comprehensive remedial scheme that itself provided for private actions and left no room for additional private remedies under Section 1983. The Court in <u>Sea Clammers</u> found this "sufficiently comprehensive" enforcement scheme in the Federal Water Pollution Control Act, where "the use of noncompliance orders, civil suits, and criminal penalties . . . evidenced a congressional intent to foreclose reliance on § 1983." <u>Wilder v. Virginia Hosp. Assoc.</u>, 496 U.S. 498, 521 , 110 S. Ct 2510, 2523 (1990). Similarly, <u>Smith v. Robinson</u>, 468 U.S. 992, 1012, 104 S. Ct 3457, 3469

(1984), held that allowing a plaintiff to circumvent the Education of the Handicapped Act's administrative remedies would be inconsistent with Congress' carefully tailored scheme, which itself allowed private parties to seek remedies for violating federal law. The inclusion of these specific remedies in the Education of the Handicapped Act "manifested Congress' desire to foreclose private reliance on Section 1983 as a remedy" through the elaboration of a "carefully tailored administrative and judicial mechanism." Wilder at 521, 110 S. Ct at 2524.

In both Sea Clammers and Smith v. Robinson, the statutes at issue themselves provided for private judicial remedies, and the Court found that the inclusion of private remedies, among other things, evidenced congressional intent to supplant the Section 1983 remedy. Wright, at 427. Under these cases, if there is a state deprivation of a 'right' secured by a federal statute, Section 1983 provides a remedial cause of action unless the state actor demonstrates by express provision, or other specific evidence from the statute itself, that Congress intended to foreclose such private enforcement. Wright, at 423. Defendant has addressed both of these cases in its Reply [Doc. 27].

Where there is no express provision in the statute curtailing a Section 1983 cause of action, the state actor must make the "difficult showing that allowing §1983 actions to go forward in these circumstances would be inconsistent with Congress' carefully tailored scheme," and courts "do not lightly conclude that Congress intended to preclude reliance on §1983 as a remedy for the deprivation of a federally secured right." Wright, at 424-25; Blessing, at 1362 (internal quotation marks omitted).

In Sea Clammers, the Court relied on the fact that the statutory scheme of the Federal Water Pollution Control Act (FWPCA) and the Marine Protection, Research, and Sanctuaries Act (MPRSA) included "unusually elaborate enforcement provisions" which conferred, on both government officials and private citizens, authority to sue. Sea Clammers, at 13. The FWPCA authorizes the EPA

11

Administrator to enforce the Act with compliance orders and civil suits; both civil fines and criminal penalties are available for violation of the Act; states are required to include in their own permit programs civil and criminal penalties; and "any interested person" is allowed to seek judicial review of various particular actions by the EPA Administrator. Most of these enforcement mechanisms are also found in the MPRSA. Id., at 14. Given this "panoply of enforcement options" (Blessing, at 1362), the Court found it "hard to believe that Congress intended to preserve the §1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions." Sea Clammers, at 20.

The statute at issue in Smith v. Robinson, the Education of the Handicapped Act (EHA), laid out a "carefully tailored scheme," indicating that "Congress intended the EHA to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." Smith, at 1008, 1009. The "elaborate procedural mechanism" of the EHA was designed to ensure that hearings conducted by the state would be fair and adequate and was meant to effect the congressional intent that "each child's individual educational needs be worked out through a process that begins on the local level and includes ongoing parental involvement, detailed procedural safeguards, and a right to judicial review." Id., at 1010-11.

The method of enforcement set forth in EMTALA is not so elaborate as that in the FWPCA and EHA. The statute requires that every "participating hospital" (not excluding publicly funded hospitals) provide the screening and treatment called for in the Act. Enforcement mechanisms in case of violation of EMTALA include the following: (1) the hospital is subject to a civil monetary penalty; (2) an individual suffering personal harm, or a medical facility suffering a financial loss, as a result of the hospital's violation may bring civil actions under EMTALA for equitable relief and recovery of

12

damages as measured by state law; and (3) the Secretary shall request a peer review assessment and report on the incident.

EMTALA explicitly provides a private right of action to an individual suffering personal harm, and such a private judicial remedy has been cited in other cases as evidence of congressional intent to supplant a Section 1983 cause of action. Wright, at 427. However, this is not the only factor to consider. The enforcement provisions of EMTALA, noted above, fall short of the "carefully tailored local administrative procedure, followed by federal judicial review" involved in Smith v. Robinson, or the "unusually elaborate enforcement mechanisms" of the Sea Clammers statute (as described in Blessing, at 1362-63).

In addition, the long-range considerations involved in Sea Clammers and Smith v. Robinson, involving as they do enforcement of water pollution controls and guarantees that handicapped children will have access to a publicly-funded education, call for the complicated, ongoing enforcement mechanisms established by the FWPCA and EHA. By contrast, the emergency nature of the "patient-dumping" incidents which EMTALA was designed to curtail do not require long-term programs or complicated mechanisms for enforcement. EMTALA does not create the kind of detailed procedural protections to ensure oversight of long-term problems such as water pollution and education of individual handicapped students, because the acute nature of the patient-dumping problem differs significantly from the chronic nature of the problems addressed in the FWPCA and EHA. The Court noted in Smith v. Robinson (at 1011-12) that allowing a handicapped child to go directly to court with a constitutional claim under §1983 would not only:

> render superfluous most of the detailed procedural protections outlined
> in the statute, but, more important, it would also run counter to
> Congress' view that the needs of handicapped children are best

13

>   accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child's education. No federal district court presented with a constitutional claim to a public education can duplicate that process.

It simply is not the case that a federal court is an inefficient forum to redress the violation by a public hospital of a patient's federally protected right not to be "dumped" in a medical emergency. There is nothing in EMTALA explicitly foreclosing a Section 1983 action, and Defendant herein has not met its heavy burden of showing that the enforcement scheme of EMTALA is sufficiently comprehensive to imply a congressional intent that the "civil enforcement" provision of 42 U.S.C. §1395dd(d)(2)(A) is meant to be the exclusive avenue to remedy statutory violations.

## Conclusion

The Court concludes that the enforcement provisions of EMTALA are sufficiently less comprehensive than, and different in nature from, the statutory schemes which in other cases were found to supplant a cause of action under Section 1983. Defendant Board of Regents has failed to meet its burden of showing a congressional intent to preclude reliance on 42 U.S.C. §1983 as a remedy for violations of federally secured rights created by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd, and the Court therefore concludes that the statute is subject to enforcement under Section 1983.

IT IS THEREFORE ORDERED that the Board of Regents of The University of New Mexico's motion to dismiss Laura Ward's 42 U.S.C. § 1983 claim for civil rights violation is denied.

_____
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEY FOR PLAINTIFF:
Guy Dicharry, Esq.

ATTORNEYS FOR PRESBYTERIAN:
Andrew G. Schultz, Esq.
MacDonnell Gordon, Esq.

ATTORNEYS FOR UNM BOARD OF REGENTS:
W. Ann Maggiore, Esq.
James S. Bromberg, Esq.

ATTORNEYS FOR FHC OPTIONS:
Gary L. Gordon, Esq.
Ruth M. Fuess, Esq.

ATTORNEY FOR DEFT. KELLOGG:
Kathleen C. Horan, Esq.